IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARC HERNANDEZ,** : | |
|    Petitioner : | No. 1:14-cr-00070-1 |
| : | |
| v. : | (Judge Kane) |
| : | |
| **UNITED STATES OF AMERICA,** : | |
|    Respondent : | |

# MEMORANDUM

Before the Court is Petitioner Marc Hernandez ("Petitioner")'s motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Doc. No. 1898.) For the following reasons, the Court will deny the motion.

## I.  BACKGROUND

In 2014, a federal grand jury returned a superseding indictment charging Petitioner and twenty (20) codefendants (collectively, "Codefendants," and with Petitioner, "Defendants") with racketeering conspiracy, 18 U.S.C. § 1962 ("RICO") (Count I), conspiracy to distribute a controlled substance, 21 U.S.C. 846 (Count II), and distribution of a controlled substance (Count III), 21 U.S.C. § 841(a).  (Doc. No. 78.)  Four Defendants were additionally charged with firearm-related offenses, including, as to Petitioner, possession of a firearm in furtherance of a drug-trafficking crime (Count V) and conspiracy of the same (Count VI).  (Id.)

The charges stemmed from Defendants' association with a violent street gang—the Southside gang, an affiliate of the Bloods, a national street gang—to perpetrate drug trafficking and other violent acts.  (Id.)  The conspiracy took place over a twelve-year period and involved deadly gang violence.  (Id.)  Nine (9) defendants entered pleas of guilty. (Doc. Nos. 1380, 1493, 1542, 1550–51, 1560, 1575, 1585.)  Twelve (12), including Petitioner, proceeded to a joint jury trial.  (Doc. Nos. 974–1027.)  The jury found all twelve guilty, in late 2015, of one or more

charges. (Doc. Nos. 911–34.) As to Petitioner, the jury found him guilty of RICO (Count I), two drug counts involving 5 kilograms or more of cocaine and 280 grams and more of crack cocaine, heroin, and marijuana (Counts II–III), possession of firearms in furtherance of drug trafficking (Count V), and conspiracy thereto (Count VI). (Doc. No. 911.)

Petitioner's presentence investigation report ("PSR") assigned him a combined adjusted offense level of 52—capped at 43 pursuant to U.S.S.G. ch. 5, pt. A, cmt. n.2—and a criminal history category of V, determining that Petitioner's guideline range was life in prison.[1] (PSR ¶¶ 324, 327, 341, 360.) As to statutory sentencing ranges, the PSR concluded that Petitioner faced maximum terms of life imprisonment on all but Count VI, which carried a maximum term of 20 years' imprisonment, and mandatory minimum terms of ten (10) years (on Counts II and III) and five (5) years (on Count V). (Id. ¶ 359.)

Regarding the underlying racketeering activity that resulted in the higher statutory maximum and guideline range, the PSR stated as follows:

> The instant RICO offense encompasses five separate underlying racketeering categories, and 109 racketeering acts (RA) as referenced in The Offense Conduct section of this report. A defendant need not have been charged with the "underlying racketeering activity," and need not have been personally involved in the activity as long as the conduct was reasonably foreseeable to him in furtherance of the RICO enterprise. Southside members were known to use violence, and had access to firearms to protect their territory. Since this activity was known to all of those involved, all of underlying activity (Racketeering Acts) were reasonably foreseeable to the participants beginning at the point they entered the RICO conspiracy.

(Id. ¶ 212.) The PSR enumerated the relevant racketeering activities, e.g., first-degree murder, attempted first-degree murder, robbery, narcotics possession/delivery. (Id. ¶¶ 213–320.)

---

[1] This life guideline range related to Petitioner's convictions on Counts I–III and VI. See (PSR ¶ 360). The guideline range regarding Count V was sixty (60) months. See (id.).

Petitioner's attorney ("Trial Counsel") objected to the PSR on numerous grounds, in his submissions (Doc. No. 1296) and at sentencing, including the PSR's guideline calculation based on drug weight (Doc. No. 1393 at 52–54, Tr. 52:18–54:18), Petitioner's role in the Southside gang (id. at 55, Tr. 55:1–13), the body armor enhancement (id. at 56, Tr. 56:2–25), Petitioner's criminal history calculation (id. at 57–58, 57:12–58:21), and the potential sentencing disparity between Petitioner and his Codefendants (id. at 58–60, Tr. 58:22–60:23). However, the Court adopted the PSR's conclusions. (Doc. No. 1323 at 1.) In doing so, the Court arrived at a guideline range of life imprisonment based a total offense level of 43 and a criminal history category of V. (Id.) The Court ultimately sentenced Petitioner to concurrent terms of life imprisonment (on Counts I–III) and 20 years (on Count VI), running consecutively to a 60-month term (on Count V). (Doc. No. 1324 at 2.)

Petitioner and nine Codefendants who proceeded to trial appealed their convictions and sentences to the United States Court of Appeals for the Third Circuit ("Third Circuit"). See United States v. Williams, 974 F.3d 320, 338 (3d Cir. 2020). The Third Circuit grouped their claims on appeal into five (5) categories: (1) Sixth Amendment challenges to this Court's closure of the courtroom to the public during voir dire; (2) challenges to the Court's in camera disposition of a challenge asserted under Batson v. Kentucky, 476 U.S. 79 (1986); (3) evidentiary challenges relating to motions to suppress evidence recovered from their residences under search warrants; (4) challenges to the sufficiency of evidence at trial; and (5) challenges to their sentences based on alleged procedural defects. See id. at 335–36. Petitioner challenged the Court's two-day closure of the courtroom to the public during jury selection which was based on courtroom capacity limitations. See Williams, 974 F.3d at 340–49. Because none of the numerous defense attorneys involved in these criminal proceedings objected to the courtroom

closure, the Third Circuit reviewed for plain error under the framework of United States v. Olano, 507 U.S. 725, 732 (1993).[2] Noting the Government's concession that the Court's Order closing the courtroom was an "error" that was "plain," the Third Circuit found it unnecessary to address the third Olano prong (whether an error affects substantial rights) because, as to the fourth Olano prong, the error of closing the courtroom during jury selection to all but court personnel, Defendants, trial counsel and support staff, and prospective jurors "did not 'seriously affect the fairness, integrity or public reputation of judicial proceedings . . . .'" See Williams, 974 F.3d at 341 (quoting Olano, 507 U.S. at 736).

While affirming all ten Defendants' judgments of conviction, and based on the Government's concession, the Third Circuit partially vacated the judgments of sentence of eight Defendants "as to the assessment of police overtime costs," vacated the judgment of sentence of one of those eight Defendants—Petitioner—in full to permit him an opportunity to make a statement or present mitigation evidence in connection with his sentencing proceedings, and vacated another of the same group of Defendants—Schueg—as to the assessment of restitution, fines, and costs. See id. at 375, 377, 380; see also (Doc. Nos. 1637, 1637-1, 1638, 1638-1, 1639, 1639-1, 1640, 1640-1, 1641, 1641-1, 1642, 1642-1, 1643, 1643-1, 1644, 1644-1, 1645, 1645-1, 1646, 1646-1).

In October 2021, this Court issued Orders effectuating the vacatur of five Defendants' judgments of sentence as to the assessment of police overtime costs and entered corresponding

---

[2] In Olano, "the Supreme Court [] described a four-part inquiry for plain-error review. There must: (1) be an 'error' that (2) is 'plain' and (3) 'affects substantial rights.'" See Williams, 974 F.3d 320, 340 (3d Cir. 2020) (quoting Olano, 507 U.S. at 732 (quoting Fed. R. Crim. P. 52(b))). "If these three conditions are satisfied, then it is within the sound discretion of the court of appeals to correct the forfeited error—but only if (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. (quoting Olano, 507 U.S. at 732) (internal quotation marks omitted).

amended judgments. (Doc. Nos. 1684–85 (Cruz), 1687–88 (Kelly), 1690–91 (Villega), 1693–94 (Atkinson), 1696–97 (Sistrunk).)[3]  In December 2021, following sentencing hearings,[4] the Court resentenced Petitioner and Schueg and issued amended Orders regarding their judgments of sentence. (Doc. Nos. 1705, 1709 (Schueg), 1711–12 (Petitioner).)

On December 29, 2021, Petitioner appealed his amended judgment to the Third Circuit. (Doc. Nos. 1714–15.) The Third Circuit affirmed the amended judgment and issued its mandate on July 17, 2023, but subsequently recalled the mandate and vacated its judgment to allow Petitioner's appointed appellate counsel to review and prepare a petition for writ of certiorari. See United States v. Hernandez, No. 21-3383 (3d Cir. July 17, 2023), ECF Nos. 48, 52–53. The Third Circuit's judgment and mandate were reissued on October 5, 2023, affirming this Court. See id., ECF Nos. 54–55. On January 3, 2024, Petitioner filed a petition for writ of certiorari to the United States Supreme Court, which was denied on February 20, 2024. See Hernandez v. United States, 144 S. Ct. 863 (Feb. 20, 2024).

Petitioner filed his pending § 2255 motion and a supporting brief in February 2025 (Doc. Nos. 1898–99), and subsequently filed a Notice of Election—in response to the Court's Miller notice—indicating that he wished to have the motion ruled on as filed (Doc. Nos. 1900–01). The Government filed a brief in opposition in May 2025 (Doc. No. 1907), and Petitioner filed a reply brief in July 2025 (Doc. No. 1912). Having been fully briefed, Petitioner's § 2255 motion is ripe

---

[3] An amended judgment was not entered as to Defendant Eatmon, whose judgment of sentence was ordered vacated as to the police overtime costs, because his original judgment did not include such costs. See (Doc. No. 1504).

[4] Petitioner's counsel at resentencing presented objections similar to those presented by Trial Counsel concerning the PSR's guideline calculations that suggested a guideline range of life imprisonment, but conceded the body armor enhancement. See (Doc. Nos. 1707; 1722 at 2–8, Tr. 2:14–8:4).

for disposition.

## II. LEGAL STANDARD

Under 28 U.S.C. § 2255(a), a federal prisoner may file a motion requesting that the sentencing court vacate, set aside, or correct his sentence on the basis "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the [C]ourt was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." See 28 U.S.C. § 2255(a). However, § 2255 does not afford a remedy for all errors that may have been made at trial or during sentencing. See United States v. Essig, 10 F.3d 968, 977 n.25 (3d Cir. 1993) (citing United States v. Addonizio, 442 U.S. 178, 185 (1979)).  Rather, § 2255 is implicated only when the alleged error raises "a fundamental defect which inherently results in a complete miscarriage of justice." See Addonizio, 442 U.S. at 185. Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petitioner has one year from the time his conviction becomes final to file a § 2255 motion. See 28 U.S.C. § 2244.

## III. DISCUSSION

Petitioner advances the following three grounds—all alleging ineffective assistance of counsel—in support of his § 2255 motion:

(1) Trial Counsel was ineffective "by failing to inform [Petitioner] on how to deal with the [G]overnment's plea offer," and had he done so, Petitioner "would have accepted the offer rather than proceed to trial";

(2) Trial Counsel was ineffective "by failing to object to the Court's findings as to drug amounts that were not included in the indictment or jury instructions"; and

(3) Trial Counsel was ineffective by failing "to properly object with legal arguments related to the closed courtroom."

See (Doc. No. 1899 at 4–37).

As his claims reflect, Petitioner seeks § 2255 relief based on the overarching assertion that his Trial Counsel provided constitutionally deficient representation in violation of the Sixth Amendment. A collateral attack of a sentence based upon a claim of ineffective assistance of counsel must meet a two-part test established by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687–88, 694 (1984). See George v. Sively, 254 F.3d 438, 443 (3d Cir. 2001). The first Strickland prong requires Petitioner to "establish first that counsel's performance was deficient." See Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001). Petitioner must show that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment. See id. To do so, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. See id. (citing Strickland, 466 U.S. at 688). There is, however, "a 'strong presumption' that counsel's performance was reasonable." See id.

Under the second Strickland prong, Petitioner "must demonstrate that he was prejudiced by counsel's errors." See id. Prejudice in this context means "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See id. (quoting Strickland, 466 U.S. at 694). Reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." See id. (quoting Strickland, 466 U.S. at 694).

Notably, Petitioner must make an adequate showing with respect to both prongs of the Strickland test in order to be entitled to relief. See Strickland, 466 U.S. at 686. A failure to make the required showing on either prong precludes a finding in Petitioner's favor. See id. at 700. "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible," courts

should address the prejudice prong first when it is dispositive of a petitioner's claims. See United States v. Cross, 308 F.3d 308, 315 (3d Cir. 2002). The Court addresses each ground asserted in Petitioner's motion in turn below.

### A.     Ground One: Failure to Advise During Plea Negotiations

Ground One of Petitioner's § 2255 motion asserts that Trial Counsel was ineffective because Trial Counsel "failed to make the appropriate assessment of the facts and give [Petitioner] the appropriate advice regarding the plea offer made by the [G]overnment." (Doc. No. 1899 at 6.) He avers that:

> [d]uring the plea negotiation stage in this case the [G]overnment made an offer of 30 years' imprisonment. Counsel assumed that [Petitioner] did not want an offer. Counsel at no time explained the likelihood of conviction, the actual evidence that would be presented, and the very real likelihood of a life sentence. Had counsel done so [Petitioner] attested that he would have accepted the offer and not elected to proceed to trial.

(Id.)[5] He claims that he was entitled to his Trial Counsel's professional legal advice, which he asserts "include[s] going over the evidence, learning of the likelihood of conviction, and the sentencing exposure that he was facing." (Id. at 12, 16.) Based on these allegations, Petitioner maintains that he has satisfied the two Strickland prongs and that the record "seems to support his allegations." (Id. at 21–22.)

In response, the Government contends that its records reflect that no written plea agreement was provided to the defense, and so the discussions between Trial Counsel and Petitioner were informal and thus, Petitioner cannot establish ineffective assistance without a formal plea offer. (Doc. No. 1907 at 12.) The Government acknowledges "that it did engage in discussions with counsel for [Petitioner] over the possibility of a resolution, but it was

---

[5] Petitioner attaches an affidavit to his § 2255 motion in which he attests that he would have accepted the plea offer. See (Doc. No. 1899-1).

[Petitioner] who cut off negotiations." (Id. at 13.) The Government also notes that Petitioner engaged in criminal conduct from prison while he awaited sentencing—conduct that "would have likely unraveled any plea negotiation [Petitioner] had with the [G]overnment." (Id. at 14.) Based on the above, the Government contends that since there was no formal offer or negotiation, "it is pure speculation to suggest that the Court would have accepted its terms—terms which are unspecified." (Id.)

Having considered Petitioner's arguments, the briefing of the parties, and the record of these criminal proceedings, the Court concludes that Petitioner has failed to establish Strickland prejudice and Ground One of his § 2255 motion is unavailing for that reason alone. The Court need not address the first Strickland prong as to Trial Counsel's performance. See Gaines v. Superintendent Benner Twp. SCI, 33 F.4th 705, 712 (3d Cir. 2022) (noting that if a § 2255 movant "makes an inadequate showing as to one of the[] [Strickland prongs], then [courts] do not need to examine the other").

Petitioner's claim in Ground One falls within the scope of Lafler v. Cooper, 132 S. Ct. 1376 (2012), and is often referred to as a "Lafler claim." To establish a Lafler claim, Petitioner must demonstrate that (1) "he would have accepted the plea offer if he had been aware of his sentencing exposure"; (2) "his guilty plea would have been accepted by the court"; and (3) "the conviction and sentence he would have received under the plea offer would have been less severe than those resulting from the trial." See id. at 1385. The first prong of the Lafler claim is essentially a more specific articulation of the second Strickland prong, which tasks the Court with deciding whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Jermyn, 266 F.3d at 282 (quoting Strickland, 466 U.S. at 694).

The Court cannot credit Petitioner's assertion that he would have pleaded guilty in exchange for a 30-year plea agreement because there is no evidence that a formal plea offer was made by the Government. The Government's brief states that:

> [i]n this district [], plea agreements are written and are based on a model plea agreement used by the United States Attorney's Office for the Middle District of Pennsylvania. Furthermore, the government notifies defendants that all terms of an agreement are not binding on the government until they have been approved by the United States Attorney for the Middle District of Pennsylvania.
>
> In this case, the records of the government indicate that no written plea agreement was provided to the defense, let alone be approved by the United States Attorney. In other words, the discussions between the [G]overnment and counsel for Hernandez were informal.

See (Doc. No. 1907 at 12). Accordingly, Petitioner has failed to satisfy the first Lafler prong, i.e., that he would have accepted the plea offer because the record does not reflect evidence of a formal plea offer. See Lafler, 132 S. Ct. at 1384 (noting "[t]he question for this Court is how to apply Strickland's prejudice test where ineffective assistance results in a rejection of the plea offer and the defendant is convicted at the ensuing trial"). Petitioner's failure to satisfy Lafler's first prong means that he fails to establish prejudice under Strickland's second prong and the Court will therefore deny Petitioner's § 2255 motion as to Ground One.

**B.       Ground Two: Failure to Object to Drug Weight Guideline Calculation**

Ground Two of Petitioner's § 2255 motion asserts that Trial Counsel failed to raise an appropriate objection to the PSR's drug weight guideline calculation—a calculation that the Court adopted as pertains to the relevant conduct, and that his counsel should have argued that the drug amount should have been limited to the quantity found by the jury. (Doc. No. 1899 at 22.) He claims that he was sentenced to a term of imprisonment "based on judicial fact finding and not in compliance with the findings of the jury." (Id. at 23.) Due to this "judicial fact finding," he maintains that he was denied his right to due process under the Fifth Amendment

10

because "he was sentenced based on a finding by the Court under the preponderance of the evidence standard and not under the beyond a reasonable doubt standard by a jury of his peers." (Id. at 24.)  Petitioner also argues that Trial Counsel failed to properly object to aggregation of drug quantities both at trial and sentencing—an error he claims is based on Alleyne v. United States, 570 U.S. 99 (2013). (Id. at 29–30.)

The Government argues that Trial Counsel objected to the drug calculation in the PSR and tried to limit the drug quantities to those found by the jury.  See (Doc. No. 1907 at 15) (citing Doc. Nos. 1150 at 6 (First Addendum to the PSR); 1296 at 16–17 (Petitioner's Sentencing Memorandum)).  The Government also notes that Petitioner's counsel at resentencing adopted the same argument.  See (id.) (citing Doc. No. 1707 at 6).  As to Petitioner's claim concerning the Alleyne-based error, the Government requests that this Court dispose of this claim for the same reasons as the Third Circuit on appeal, stating that "[a]lthough the circuit took issue with the jury instruction as it applied to the mandatory minimum, i.e. found an Alleyne violation, the circuit found no violation of Apprendi[v. New Jersey, 530 U.S. 466 (2000)]."  See (id. at 16) (emphasis in original).  The Government argues that Petitioner and his Codefendants suffered no prejudice from the "errant instruction" (id. at 18), explaining as follows:

> At the conclusion of the trial, the Court advised the jury of how they were to determine drug weight.  Doc. 1024, p. 213.  With respect to the substantive charge at Count 3 (21 U.S.C. §841), the jury was allowed to aggregate the drug weight over a period of time.  Id.  For the conspiracy offenses, they were advised that in making this decision, they "should consider all controlled substances that members of the conspiracy actually possessed with intent to distribute or distributed."  Doc. 1024, p. 213.  The jury was not asked to make an additional, individual determination of drug weight for each defendant.  Id.  [Petitioner]'s [T]rial [C]ounsel did not object to these instructions nor did any other defendant.  These instructions were partially in error.  Williams, 974 F.3d at 365.
>
> At Count 3, the Third Circuit found insufficient evidence to support the verdict regarding drug weight.  Relying on United States v. Rowe, 919 F.3d 752, 759–60 (2019), the court reiterated that multiple transactions over a period of time should

11

not be aggregated to determine the drug weight for a substantive drug trafficking offense. Williams, 974 F.3d at 365. [Petitioner] and his codefendants failed to raise the issue at trial, thus plain error applied. But, the circuit found that [Petitioner] and codefendants suffered no prejudice because there was sufficient evidence of their guilt, and the enhanced sentence was totally concurrent with the other sentences imposed. Id.

With respect to drug quantity on the conspiracy counts, the Third Circuit explained a two-step process. Id. at 365. The two-step process addresses the drug quantity that is attributable for statutory maximum purposes under Apprendi v. New Jersey, 530 U.S. 466 (2000) and the drug quantity attributable for mandatory minimum purposes under Alleyne v. United States, 570 U.S. 99 (2013)[;] Williams, 974 F.3d at 365. To resolve the question of the statutory maximum, a jury must find the "quantity attributable to the conspiracy as a whole." Id. To resolve what mandatory minimum applies to an individual defendant, a jury must be instructed to "attribute to a defendant only those quantities involved in violations of § 841(a) that were within the scope of, or in furtherance of, the conspiracy and were reasonably foreseeable to the defendant as a consequence of the unlawful agreement." Id. at 366. In this case, the instruction given by the Court corresponded with what a jury must decide to determine the statutory maximum punishment. Id. In other words there was no error when the jury decided that the drug weight attributable to the conspiracy was properly instructed and supported by the evidence. Id. However, for the mandatory minimum, the jury instruction was insufficient because it failed to ask the jury to determine how much drug weight [Petitioner] was responsible for. Id.

Since the matter was not preserved at the trial court, the circuit considered the issue for plain error review. Id. In so doing, the circuit considered whether there was a reasonable probability of a different result for the defendant. Id. at 367 (quoting United States v. Dominguez Benitez, 542 U.S. 74, 82 (2004)). The Third Circuit held that there was not. Williams, 974 F.3d at 367. Since the sentence imposed for [Petitioner] (and other defendants) was above the mandatory minimum, the error did not affect his substantial rights and thus he was not eligible for relief. Id.

The same analysis applies here. The statutory maximum for Count 1 (RICO Conspiracy) and Count 2 (Drug Trafficking Conspiracy) were properly found by the jury in accordance with Apprendi. Williams, 974 F.3d at 365. The jury was properly instructed to consider all of the drugs attributable to the conspiracy as a whole.

With respect to the Alleyne / mandatory minimum error, [Petitioner] received a life sentence which is well above the 10-year mandatory minimum applicable, thus he suffered no prejudice from the jury instruction. Finally, with respect to the Rowe error, his sentence at Count 3 was totally concurrent with his sentences at Counts 1 and 2, and therefore he suffered no prejudice. [Petitioner]'s claim should be dismissed for failure to establish prejudice.

See (id. at 17–20) (footnotes omitted and emphasis in original).

Having considered Petitioner's arguments, the briefing of the parties, and the record of these criminal proceedings, the Court concludes that Petitioner has failed to establish that Trial Counsel's performance was ineffective in this regard because the record clearly demonstrates that Trial Counsel, as well as his counsel at resentencing, raised the objection that Petitioner argues he did not raise, including objections to the PSR's conclusion that Petitioner was responsible for drug weights based on relevant conduct that was part of jointly undertaken criminal activity. See, e.g., (Doc. Nos. 1296 at 16 (objecting to the PSR's attempt "to assign responsibility of at least 28.061 kilograms of crack cocaine" and that the PSR's finding "in this regard is pure speculation"); 1707 at 6 (incorporating and renewing Petitioner's original objections to the PSR and his original sentencing memorandum)). Because the record conclusively controverts Petitioner's claim that Trial Counsel failed to raise the objections as to the drug weight at sentencing, Petitioner's claim is without merit.

Insofar as Petitioner raises an issue concerning the aggregation of drug quantities at trial (Doc. No. 1899 at 29–30), the Court notes that the jury, at trial, was allowed to aggregate the drug weight over a period of time when considering Count III (21 U.S.C. § 841(A)(1)).[6]

---

[6] Section 841(A)(i) provides that "[i]t shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." See 21 U.S.C. § 841(A)(1)). In the context of drug-trafficking conspiracy charges brought pursuant to 21 U.S.C. § 846 where "drug quantities are charged pursuant to [21 U.S.C.] § 841(b)(1)(c)," the "statutory maximum term of imprisonment is to be determined according to the amount of drugs involved in the conspiracy as a whole," whereas the mandatory minimum term is "determined only according to the aggregate quantity of drugs involved in those violations of § 841(a) that were within the scope of the conspiracy, or in furtherance of it, and were reasonably foreseeable to the defendant as a natural consequence of his unlawful agreement." See Williams, 974 F.3d at 372.

13

However, on appeal, the Third Circuit found insufficient evidence to support the verdict regarding the drug weight because multiple transactions over a period of time should not be aggregated to determine the drug weight for a substantive drug trafficking offense. See Williams, 974 F.3d at 364–67 (relying on Rowe, 919 F.3d at 759–60). Because Petitioner and his Codefendants failed to raise the issue at trial, plain error review applied to the issue on appeal. The Third Circuit concluded that "[t]here was sufficient evidence upon which a rational juror could have concluded that these six Defendants [including Petitioner] were guilty under § 846 and were responsible for 280 grams or more of crack" and because of that conclusion, "the Rowe error on Count III did not affect their substantial rights" because "[t]heir statutory maximum terms of imprisonment would have been life even if the Rowe error had not occurred." See id. at 373–74. Petitioner has failed to establish that "there is 'a reasonable probability that, but for the error claimed,' the Defendants' terms of imprisonment would have been different." See Williams, 974 F.3d at 367 (quoting Dominguez Benitez, 542 U.S. at 82). Accordingly, the Court will deny Petitioner's motion as to Ground Two.

### C. Ground Three: Failure to Object to Two-Day Courtroom Closing

Ground Three of Petitioner's motion asserts that Trial Counsel was constitutionally ineffective for failing to object to the Court's decision to close the courtroom to the public for two days during voir dire. (Doc. No. 1899 at 35–37.) In this regard, the "Sixth Amendment requires that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.'" See United States v. Gallman, 57 F.4th 122, 126 (3d Cir. 2023) (alteration in original) (quoting U.S. Const. amend. VI). Invoking this Sixth Amendment right, Petitioner argues:

> The Court made no express and specific findings as to why such closure was necessary, pursuant to the four-part test set forth in Waller v. Georgia, 467 U.S. 39

> (1984). In doing so[,] [Petitioner] was denied his right under the [C]onstitution's Sixth Amendment right—to a public trial. As the closure in this case was affirmatively ordered by the [C]ourt, was complete, and for the entirety of jury selection, it was particularly serious.
>
> . . . .
>
> Counsel did not make a proper objection to this blatant violation of [Petitioner]'s constitutional rights. Counsel acting under professional norms would have done so. At the time that this happened there was more than a reasonable probability that counsel objected that the outcome of the case would have been different. There would have been no closure and or the record would have been made on appeal, not resulting in plain error review.

See (Doc. No. 1899 at 36–37).

In response, the Government notes that the Court issued a written Order closing the courtroom to the public during jury selection due to courtroom capacity limitations. See (Doc. No. 1907 at 22) (citing Doc. No. 737). Although the Government "does not contest" that Petitioner and his Codefendants' counsel "should have objected," the Government argues that for Petitioner to be successful, Petitioner must also establish prejudice under the second Strickland prong. (Id. at 23–24.) The Government contends that Petitioner cannot establish prejudice because he "generally alleges prejudice and notes that there were members of the public who would have been present for jury selection," and "[t]o the extent that he is arguing their presence would have changed the outcome of the proceedings, the claim is without merit." (Id. at 28.)

The Court has thoroughly reviewed the record and the parties' arguments and concludes that Petitioner has failed to satisfy the second Strickland prong. The Court notes at the outset that controlling case law dictates that "closing voir dire" to the public does not automatically give rise to a presumption of prejudice under the relevant case law. See Barney v. Adm'r of N.J. State Prisons, 48 F.4th 162, 165 (3d Cir. 2022) (stating that "[o]n habeas, not all structural errors require automatic reversal"); Baxter v. Superintendent Coal Twp. SCI, 998 F.3d 542, 547–48

(3d Cir. 2021) (citing Weaver v. Massachusetts, 582 U.S. 286 (2017)) (stating that "closing voir dire is not akin to closing the part of trial where the evidence is being adduced, and thus prejudice was not presumed"). Therefore, the issue of whether Petitioner has established prejudice turns on the circumstances under which the closure occurred.

Applying various factors identified by the Supreme Court and Third Circuit bearing on the issue of whether and the extent to which a courtroom closure causes prejudice, the Court finds that the circumstances here do not establish prejudice for purposes of Strickland's second prong. In this case, as in Weaver, while "[i]t is . . . possible that potential jurors might have behaved differently if [the individuals who were prevented from viewing the trial] had been present" and that "the presence of the public might have had some bearing on juror reaction," Petitioner "offer[s] no evidence or legal argument establishing prejudice in the sense of a reasonable probability of a different outcome but for counsel's failure to object." See Weaver, 582 U.S. at 303 (internal quotation marks omitted). As the Third Circuit noted on appeal, "although the closure encompassed all of the jury-selection phase, those proceedings lasted only two days; the public had access to all other phases of the trial, which in total lasted longer than seven weeks." See Williams, 974 F.3d at 346. Further, "a transcript of the proceedings was produced and later disclosed," and "knowledge both of the media's attention to the trial and of the transcript's production (which ensures publicity in perpetuity) may have had a similar effect on the proceedings' participants as real-time public access would have had, keeping them 'keenly alive to a sense of their responsibility and to the importance of their functions.'" See id. at 346–47 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)). "In addition, although the general public was not, absent authorization, able to be present at jury selection, as in Weaver, 'there were many members of the venire who did not become jurors but who did observe the

16

proceedings.'" Id. at 347 (quoting Weaver, 582 U.S. at 304).  There has, moreover, "been 'no suggestion of misbehavior by the prosecutor, judge, or any other party; and no suggestion that any of the participants failed to approach their duties with the neutrality and serious purpose that our system demands.'"  See id. (quoting Weaver, 582 U.S. at 304).

The Court also finds persuasive the Government's arguments drawing, in part, on the Third Circuit's reasoning on the issue of prejudice.  In its briefing, the Government argues:

> [Petitioner] simply cannot establish prejudice.  He generally alleges prejudice and notes that there were members of the public who would have been present for jury selection.  To the extent that he is arguing their presence would have changed the outcome of the proceedings, the claim is without merit.
>
> While a public trial can benefit the accused to the extent that "the presence of interested spectators may keep the defendant's trier keenly alive to a sense of their responsibility and to the importance of their functions," Williams, 974 F.3d at 346 (quoting Waller, 467 [U.S.] at 46), here the public was excluded for two-days of jury selection in a seven-week trial.  The potential for prejudice is confined to the jury selection.  The transcriptions of the jury selection were public.  There is no indication that any juror falsified information or would have otherwise been exposed as unqualified to serve if the proceedings had been public.  Nor is there evidence that the judge, prosecutors, or other court personnel engaged in misconduct during jury selection which would have been minimized or thwarted by a public proceeding.
>
> Additionally, there were at least twenty-five people in the defense camps who watched the jury selection process.  This is a far greater than normal public presence at jury selection.  Due to the size of the venire panel and the number of defendants, the courtroom was packed with people.  So, although the venire members do not qualify as the "public" for Sixth Amendment purposes, the distinction between members of the public and fellow venire members was probably lost on the individuals as they proceeded through jury selection.  The combination of people in the packed courtroom, plus the oath they took and the admonition from the court that all they said was being stenographically recorded, placed sufficient social and legal pressure on each juror to answer honestly.  The court should have confidence that allowing some members of the public to watch the proceedings would have changed nothing.  This dynamic was only amplified by the twenty-five plus members of the defense camps who were present and scrutinizing the venire members. Any suggestion that a more public spotlight on jury selection would have resulted in a different jury is pure speculation.  There is nothing to suggest that a different jury would have resolved this case differently.

17

(Doc. No. 1907 at 28–29.)

For these reasons—and based on the authorities and the Third Circuit's prior discussion of the circumstances of the courtroom closure—the Court concludes that Petitioner has not established that Trial Counsel's failure to object to the two-day courtroom closure during voir dire prejudiced him. Petitioner advances no argument that, but for Trial Counsel's failure to object to the closure, "the result of [his criminal] proceeding would have been different." See Strickland, 466 U.S. at 694. He generally alleges that "there was more than a reasonable probability that counsel objected that the outcome of the case would have been different," but does not explain how the presence of the public would have changed the outcome of the proceedings. (Doc. No. 1899 at 37.) These allegations, when viewed under the standard and case law discussed above, do not establish Strickland prejudice resulting from the failure to object to the courtroom closure under the circumstances of this case, and the record is otherwise bereft of any indications of prejudice.[7] The Court will therefore deny Petitioner's motion as to Ground Three.

---

[7] The Court in Weaver (and the Third Circuit in Baxter) assumed, without deciding, that prejudice from a structural error can be established by a showing of "fundamental unfairness." See Weaver, 582 U.S. at 301 ("[T]he burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or, as the Court has assumed for these purposes, to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." (emphasis added)); see also Baxter, 998 F.3d at 548 (assuming "that prejudice can be shown by a demonstration of fundamental unfairness" (quoting Weaver, 582 U.S. at 304)). But "not every public-trial violation will in fact lead to a fundamentally unfair trial," see Weaver, 582 U.S. at 298, and a two-day courtroom closure during voir dire, absent any additional circumstances suggesting fundamental unfairness, does not, in the Court's view, satisfy the prejudice prong of Strickland here.

18

### D. Evidentiary Hearing

Section 2255(b) advises that a petitioner may be entitled to a hearing on his motion. The decision to hold a hearing is wholly within the discretion of the district court. See Gov't of V.I. v. Forte, 865 F.2d 59, 62 (3d Cir. 1989). If "the files and records of the case conclusively show that the prisoner is entitled to no relief," the Court need not hold a hearing. See 28 U.S.C. § 2255(b). In determining whether a hearing must be held regarding claims of ineffective assistance of counsel, the Court must first "accept as true the nonfrivolous allegations in the petition" and then "determine whether, on the existing record, those claims that are nonfrivolous conclusively fail to show ineffective assistance of counsel." See United States v. Dawson, 857 F.2d 923, 927-28 (3d Cir. 1988); see also United States v. Arrington, 13 F.4th 331, 334 (3d Cir. 2021) (applying standard as set forth in Dawson). Here, assuming the truth of Petitioner's nonfrivolous allegations but not of the conclusory and speculative ones, the Court finds that he has conclusively failed to establish ineffective assistance of counsel as to any of his grounds for relief. Accordingly, the Court finds no reason to hold an evidentiary hearing in this matter.

### E. Certificate of Appealability

In proceedings brought under § 2255, a petitioner cannot appeal to the circuit court unless a certificate of appealability ("COA") has been issued. A court may not issue a COA unless "the applicant has made a substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322 (2003). In this case, the Court concludes that jurists of reason would not find the disposition of this case debatable. Accordingly, the Court will not

issue a COA.

### IV. CONCLUSION

For the foregoing reasons, the Court will deny Petitioner's § 2255 motion (Doc. No. 1898) without an evidentiary hearing and will not issue a COA. An appropriate Order follows.

          s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania